**Robert JANUSAITIS, Plaintiff-Appellant,**

v.

**MIDDLEBURY VOLUNTEER FIRE DEPARTMENT et al., Defendants-Appellees.**

**No. 1111, Docket 79–7175.**

United States Court of Appeals, Second Circuit.

Argued May 21, 1979.

Decided Sept. 19, 1979.

**18**

Frederick W. Krug, Waterbury, Conn. (Martha Stone, Connecticut Civ. Liberties Union Foundation, Hartford, Conn., of counsel), for plaintiff-appellant.

John C. Bullock, Waterbury, Conn. (Anthony M. Fitzgerald, Waterbury, Conn., of counsel), for defendants-appellees.

Before MANSFIELD and GURFEIN, Circuit Judges, and LEVAL, District Judge.*

GURFEIN, Circuit Judge:

Appellant, Robert Janusaitis, a volunteer fireman, sued the Middlebury Volunteer Fire Department [MVFD or the Department], the chief of MVFD [the Chief], and the Members of the Executive Committee of MVFD under 42 U.S.C. §§ 1983, 1985 and 1988. He sought a declaration that his dismissal from the MVFD violated his First Amendment rights. He also requested an injunction ordering his reinstatement. In addition, he challenged the validity of the regulation under which he was dismissed on

* The Honorable Pierre N. Leval, United States District Judge for the Southern District of New York, sitting by designation.

1. Although § 1985(3) does provide a cause of action in some instances against private persons, it cannot be used for that purpose here

the grounds of vagueness and overbreadth. After a trial on the merits, the United States District Court for the District of Connecticut (Hon. Ellen B. Burns, Judge) dismissed the action on the grounds that the MVFD's expulsion of the appellant did not constitute state action[1] and that, assuming state action, the dismissal did not violate the plaintiff's rights since there were sufficient grounds for dismissal independent of any First Amendment rights.

We hold that the Department's dismissal of the appellant from the MVFD constituted state action and that his conduct involved speech, but that balancing appellant's abrasive and personally motivated conduct against the particular need for close and harmonious relations among the members of a volunteer fire force, the dismissal did not violate appellant's First Amendment rights. We hold, moreover, that Rule 13 of the Department's By-laws, under which the appellant was dismissed, is neither unconstitutionally vague nor overbroad as applied.

Appellant joined MVFD in 1973 at the age of eighteen. In 1976, the membership elected him lieutenant for a one-year period. The events giving rise to this cause of action occurred between April and November of 1977 when he was a twenty-two year old accountant.

In April 1977 appellant submitted a report containing numerous criticisms of the management of the Department to the Executive Committee, a small body of non-officers. The report included charges that morale was low, that training and discipline were inadequate, that accounting procedures deviated from generally accepted accounting principles, and that his past recommendations on these subjects had been ignored.

since the First Amendment itself applies only where state action is involved. *See Arnold v. Tiffany,* 487 F.2d 216, 219 (9th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974).

In July, apparently dissatisfied with the reaction of the Executive Committee, the appellant drafted a letter to the Internal Revenue Service. The text was as follows:

Dear Mr. Alexander:

I hereby relinquish myself from all liability both financially and crimminally [sic] from any action against the Middlebury Volunteer Fire Department, concerning their accounting procedures.

I have notified the department that they are violating the Internal Revenue Code and generally accepted accounting principles.

I can document all my findings.

The appellant handed a copy of the letter to the Chief and to the Chairman of the Executive Committee, and threatened to mail the original to the IRS if accounting practices were not changed promptly. Though a committee was appointed on July 11 to investigate the tax exempt status and accounting policies of the Department, both the Executive Committee and the Chief were annoyed by the threat and determined that some disciplinary action was warranted. The Chief initially executed an informal suspension and then, after the Executive Committee formally recommended a 30-day suspension, suspended the appellant pursuant to Rule 13 of the By-laws, which provides for the discipline of any member engaging in "unbecoming conduct detrimental to the welfare or good name of the Department." At the time of the suspension, the appellant admitted that he was aware of the Department's policy that complaints should first be brought in house, and conceded that his conduct was in error.[2]

On September 4, several days after returning to active duty, the appellant, nevertheless, wrote a letter to the Chief charging that his suspension was politically motivated and that the actions of the officers and Executive Committee with regard to the suspension were malicious, reckless, imprudent, illogical, immoral, unethical and in violation of the appellant's rights "as a citizen of the United States . . . ." The appellant demanded "an *immediate* apology." In addition, the appellant consulted a law firm, which wrote to the Executive Committee requesting that the suspension be expunged and suggesting that otherwise litigation would follow.

On October 24, the appellant delivered a letter to the First Selectman of the Town. The cover page stated, "Attached is a copy of a letter which will be sent to the news media within seven (7) days." The attached letter, addressed to the editor of a Waterbury paper with copies to two other local papers and a radio-TV station, suggested that the First Selectman lacked "respect for the law," that the Department and the First Selectman were trying to "cover up," and that the appellant, "with deep regret," was planning to sue the Department for "violating [his] rights as a citizen of this country." When the Selectman showed him the letter one week later, the Chief stated, "[T]his is it—he's got to go." The Chief promised the Selectman, however, that he would discuss the letter with no one until after the coming election, then one week away.

The final episode in the events preceding the dismissal concerns a newspaper story, published on November 5, entitled "Fireman Tells Story After Reinstatement." The story, printed after several conversations between the appellant and a reporter, stated appellant's complaint with regard to the failure of MVFD to have its own federal income tax number as a non-profit organization, indicated that appellant intended to bring the matter to the attention of the Internal Revenue Service if the violations were not corrected, and reported that appellant was considering suing the MVFD on the ground that the 30-day suspension involved a denial of due process.[3]

On November 6 the Chief summoned appellant to appear before a meeting of the officers on November 9 "to discuss [appel-

---

2. In addition, the Chief informed appellant that any future letter-writing incidents would be cause for dismissal.

3. Appellant has now dropped this claim on appeal.

lant's] recent conduct in statements made and documented in public which may constitute conduct detrimental to the good of the Department." At the conclusion of the meeting the appellant was dismissed from the Department. In a subsequent letter detailing the grounds for dismissal the Chief pointed to dereliction of duties, the threat posed by the IRS letter, the threat of legal action if the suspension were not rescinded, misinformation given to the public in the newspaper article with regard to the grounds for the suspension, the threat to the First Selectman, and contribution to the decline of morale as well as participation in "activities detrimental to the Good Welfare of the Department."[4] On appeal to the Executive Committee, the dismissal was upheld by a unanimous vote.

4.                              November 20, 1977
Mr. Robert Janusaitis
639 Whittemore Road
Middlebury, Connecticut 06762
Dear Mr. Janusaitis:
    In response to your letter dated November 11, 1977 the following are those items which constitute your violations of Section 13 and Section 15 of the By-Laws of the Middlebury Volunteer Fire Department.
1. Failure to attend October 16, 1977 Super Drill, failure to notify Officers of inability to complete duties that were assinged [sic] one week in advance for the Drill.
2. Failure to follow established procedures by bringing complaints to the Executive Committee and not to the Membership and the Officers.
3. Failure to report to the Senior Officer at the scene of a Fire or Emergency. Ie: Porter Ave. —wanted to lay line, Westover School—wanted to lay line, Matasavage—wanted to lay line.
4. Takes matters into his own hands without advising or receiveing [sic] permission from the Chief or Officer-in Charge. Ie: Promised the Civil Defense he would take them to the Wolcott Fire School.
5. Failure to complete Assingments [sic]
    a. Cardio-plumonary [sic] Resuscitation Courses for the Department and the Public, assigned 12/13/76 by Director of Training.
    b. Maintain the Fire Department Roster, assigned 12/13/76 by the Director of Training.
    c. Maintain the Department Physicals, assigned 12/13/76.
    d. No prgram [sic] of Building Tours Completed. (3 all year: Mansons/WWCO— 12/4; Hamlet—12/11; Westex W—12/18)

The District Court's first ground for dismissing the complaint was that the actions of the MVFD did not constitute the state action required under § 1983 and the Fourteenth Amendment. In so concluding, the Court relied largely on the "nexus" test of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Applying the five indicia of state action set out in *Jackson v. The Statler Foundation,* 496 F.2d 623 (2d Cir. 1974), the Court concluded that while the financial contribution by the Town to the MVFD was considerable, the dismissal of the plaintiff could not be considered state action because the Town was not involved in the regulation of departmental activities, and there was no nexus between the Town's involvement with the Department and the disciplinary activities of the Department.[5]

    e. No progress on Fire Prevention and Public Relation Programs assigned on 12/20/76.
6. Threatening the Executive Committee of the Middlebury Volunteer Fire Department by writing a letter to the Internal Revenue Service accusing the Department of Criminal Activities.
7. Threatened legal action against the Town of Middlebury and the Middlebury Volunteer Fire Department, in a letter to the Chief, if suspension is not rescinded.
8. Misinformed the public in a newspaper article, stating a suspension was received for criticizing the Department in a report submitted to the Executive Committee. Suspension was for the threat to the Executive Committee in a writing of a letter to the Internal Revenue Service, and since the letter was written by Lieutenant Robert Janusaitis, it was written without any authorization from the Department.
9. Threatened the First Selectman of the Town of Middlebury with an ultimatum if he did not comply with the requests made in a letter to him.
10. Contributed to the Decline of moral [sic] and participated in activities detrimental to the Good Welfare of the Department.
                Sincerely,
                [signed] Edward B. St. John
                Edward B. St. John, Ph.D.
                Chief of Department
CERTIFIED MAIL (RRR)
CC:   Executive Committee
        file

5. Judge Burns noted in her opinion below that the Connecticut state courts have held that provision of fire protection by a municipality is an exercise of a public or governmental duty. *See O'Donnell v. Groton,* 108 Conn. 622, 144 A. 468, 470 (1929). *Brock-Hall Dairy Co. v. City*

In its discussion of state action, the District Court rejected as inapplicable the doctrine of *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961),[6] and distinguished earlier cases which found state action by volunteer fire departments, *see Everett v. Riverside Hose Co. No. 4, Inc.,* 261 F.Supp. 463 (S.D.N.Y. 1966); *Williams v. Rescue Fire Co.,* 254 F.Supp. 556 (D.Md.1966), on the ground that those cases involved allegations of racial discrimination and were thus subject to a less exacting standard. It also distinguished *Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford, Conn.,* 381 F.Supp. 191 (D.Conn.1974), *aff'd,* 514 F.2d 285 (2d Cir. 1975), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). In *Holodnak, supra,* 514 F.2d at 288–89, we explained the meaning of *Burton* and applied it to a First Amendment violation. In *Burton* the private lessee of a restaurant in a state parking authority complex had engaged in racial discrimination. Chief Judge Kaufman noted that "because the Parking Authority had 'insinuated itself into a position of interdependence' with the restaurant in carrying out its accepted governmental responsibilities, it had an obvious interest in the permissibility of the challenged activity. . . ." "To fail to recognize state action . . . would, in many cases, permit the Government to endorse and encourage conduct in which it could not itself permissibly engage."

Judge Burns, after concluding that the dismissal of the appellant did not constitute state action, noted that even if state action were present, the facts would not support the First Amendment claim. The Court apparently assumed that of the various communications involved only the communications with the newspaper implicated First Amendment protections. Since the facts showed that the communication with the newspaper was "not the primary or even substantial reason for [appellant's] dismissal," the Court concluded that the dismissal was not unconstitutional under the holding of *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[7]

## STATE ACTION

The Middlebury Volunteer Fire Department was established in January 1941 after a special town meeting. The Department performs its fire-fighting functions pursuant to an agreement with the Town promulgated under a state statute authorizing any town to "enter into an agreement with any volunteer fire company or companies within the town for the protection thereof from fire on such conditions as to financial assistance and the observance of the regulations of the board of selectmen, town council or board of fire commissioners as such ordinance prescribes . . . ." Conn.Gen. Stat. § 7–301. The state also provides, by statute, that a municipality must indemnify volunteer firemen to the extent of any damage for which they become liable in the course of fire-fighting duties, Conn.Gen. Stat. § 7–308, and that volunteer firemen "shall be construed to be employees of the municipality" for purposes of workmen's compensation. Conn.Gen.Stat. § 7–314a.

The Town Board of Selectmen has final vote of approval of the person elected by the membership as Chief of the MVFD. The Department occupies land and buildings which are owned by the Town free of charge, and also uses fire-fighting equipment owned by the Town. In its budget for fiscal year 1976–1977, the Town provided the sum of $37,714 for fire protection and in April of 1978 ordered a new truck at a cost of $68,000 for use by MVFD. Although all the members of the Department are unpaid, the Town reimburses them twice a year for travel expenses to and from fires.

*of New Haven,* 122 Conn. 321, 189 A. 182, 183 (1937).

**6.** In particular, the District Court noted that "*Burton* and its progeny deal with invidious racial discrimination. . . ."

**7.** The District Court did not discuss the issues of vagueness and overbreadth. It did address the issue of procedural due process, but that issue is not raised on appeal.

The Town has no ordinances, rules or regulations relating to such membership practices as discipline and termination, nor has the Town ever become involved in these practices.

This case presents the question, mentioned but not decided in *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 163–64, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978), whether fire protection is a function so traditionally associated with sovereignty that its performance, even by an otherwise "private" entity, constitutes state action.[8] We find that it is such a function, and that the nexus test of *Jackson v. Metropolitan Edison,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and the five factors mentioned in *Jackson v. The Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974), are therefore not preconditions to a finding of state action.

In *Jackson v. Metropolitan Edison Co., supra,* the Supreme Court stated that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." 419 U.S. at 350, 95 S.Ct. at 453 (1974). The Court indicated that where a claim of state action is grounded in government regulation of a private entity "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 350–51, 95 S.Ct. at 453.

The Court in *Metropolitan Edison* recognized however that there could be "state action present in the exercise by a private entity of powers traditionally exclusively reserved to the state. *See, e. g., Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (election); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (election); *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park)." *Id.* 419 U.S. at 352, 95 S.Ct. at 454.

In addition, the Supreme Court, citing *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), recognized that a "symbiotic relationship" between a state and a private entity can also effect state action. Even if, as suggested in the *Metropolitan Edison* case, the actual holding in *Burton* was limited to "lessees of public property," 419 U.S. at 358, 95 S.Ct. 449, the Volunteer Fire Department of Middlebury functioned only with the use of firefighting and ambulance equipment owned by the state agency—the town. *See Chalfant v. Wilmington Institute,* 574 F.2d 739, 745 (3d Cir. 1978).

In *Jackson v. Statler Foundation, supra,* this court set out, as noted, five indicia of state action, one of which was "the extent to which the organization serves a public function or acts as surrogate for the State." It is true that we said there that "no one factor is conclusive", *id.,* but that case was decided before *Metropolitan Edison* isolated as a significant indicium of its own "the exercise by a private entity of powers traditionally exclusively reserved to the state," *supra.*

The Supreme Court reiterated this thought in *Flagg Bros., Inc. v. Brooks, supra,* when, in refining it, the Court categorized a number of its cases as falling within "the municipal-function theory" 436 U.S. at 159, 98 S.Ct. at 1735.

The Court stated:

Among [such exclusive municipal functions] are such functions as education, fire and police protection, and tax collection. We express no view as to the extent, if any, to which a city or state might be free to delegate to private parties the performance of such functions and thereby avoid the strictures of the Fourteenth Amendment.

436 U.S. at 163–64, 98 S.Ct. at 1737.

We are now under the necessity of deciding not how far the city or town is free to

---

8. 42 U.S.C. § 1983 is apposite only when the person against whom the provision is invoked has acted under color of state law. This jurisdictional prerequisite is congruent to the state action concept. *United States v. Price,* 383 U.S. 787, 974 n.7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *Perez v. Sugarman,* 499 F.2d 761, 764 (2d Cir. 1974).

delegate to private parties the performance of the function of fire protection, but whether such delegation in the circumstances can free the state of the restraints of the Fourteenth Amendment. "Only by sifting facts and weighing circumstances," *Burton v. Wilmington Parking Authority, supra,* 365 U.S. at 722, 81 S.Ct. 856, "can we determine whether the reach of the Fourteenth Amendment extends to a particular case." *Evans v. Newton,* 382 U.S. 296, 299–300, 86 S.Ct. 486, 489, 15 L.Ed.2d 373 (1966).

We recognize that in assessing whether there has been state action there is authority which assumes that racial equality is more likely to be protected than other Fourteenth Amendment freedoms. *See, e. g., Weise v. Syracuse University,* 522 F.2d 397, 406 (2d Cir. 1975); *but cf. Downs v. Sawtelle,* 574 F.2d 1, 6 at n.5 (1st Cir. 1978), *cert. denied,* 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 255 (1979). However, in *Holodnak v. Avco Corp., supra,* 514 F.2d at 288–89 (2d Cir. 1975), we upheld a free speech claim under the state action rubric of a "symbiotic relationship," thereby going beyond racial discrimination alone in our application of *Burton.* And the Third Circuit has said explicitly that "only if no state involvement is found under *Burton* should the district court then search for state action under the *Jackson* test." *Chalfant v. Wilmington Institute,* 574 F.2d 739, 746 (3d Cir. 1978).

Thus, while it is true that the actual dismissal of appellant was made by the Chief with the concurrence of the Executive Committee, and not by the Town itself, it is not necessary that the Town participate to find the dismissal a form of state action. It is enough that by virtue of its function and its relationship to the Town, the MVFD is an agency of the state. As Judge Gibbons noted critically in *Chalfant, supra,* "[T]he [District] [C]ourt looked at the status of the agent to determine the nature of the principal." *Id. See also, Robinson v. Bergstrom,* 579 F.2d 400, 407 (7th Cir. 1978).

We turn then to examine "the nature of the principal." We believe that under either the "symbiotic relationship" test or the

"public function" test there is state action here. Although the two types of cases are often treated as interchangeable they involve somewhat different inquiries. The *Burton* doctrine turns on the extent to which, under all the circumstances, the interests of the governmental and private entities are so intertwined that the state must be recognized as "a joint participant in the challenged activity . . . ." *Burton, supra,* 365 U.S. at 725, 81 S.Ct. at 862. The public function doctrine focuses less on the degree of government involvement and more on the nature of the function performed by an entity which might otherwise be considered private. If the function is one which is traditionally within the exclusive province of government, the entity performing that function may be considered to be an instrumentality of the government.

Many of the same indicia of state involvement as were present in *Holodnak, supra,* are present in the case now before us. The MVFD occupies land and buildings owned by the Town and conducts nearly all of its activities on those premises free of charge. The fire-fighting equipment used by the Department is owned by the Town. There are few governmental interests more compelling than that of protection from fire. The Town Board of Selectmen is statutorily authorized to oversee the operations of the Department and does, in fact, retain final approval of the selection of the Chief, who was the principal actor in the disciplinary action against the appellant. The District Court's emphasis on the non-governmental nature of its membership and of its disciplinary practices as well as the Town's lack of involvement in such practices is misplaced to the extent that such an emphasis injects into the *Burton*-type of analysis a nexus requirement.

Even if the Town, by specific acts of involvement and control, did not "insinuate[ ] itself into a position of interdependence" with the Department within the meaning of *Burton,* we believe that the function of fire protection is sufficiently "associated with sovereignty," *Jackson v. Metropolitan Edison, supra,* 419 U.S. at 353,

95 S.Ct. 449, to justify treating the Department as an "instrumentalit[y] of the state and subject to its constitutional limitations." *Evans v. Newton, supra,* 382 U.S. at 299, 86 S.Ct. at 488.[9]

Fire protection is "a function public or governmental in nature . . . which would have to be performed by the Government but for the activities" of volunteer departments. *Perez v. Sugarman, supra,* 499 F.2d at 765 (relating to a child-care institution). The provision of fire protection is even more clearly an attribute of sovereignty than is the provision of care for neglected children, since in the latter case the government substitutes its own services for those which are generally private. Yet in *Perez,* we found that a child-care institute performed a public function.[10] The government's interest in fire safety is at least as compelling as its interest in "educating the public," an interest held sufficient by the Third Circuit to support treating a library as an instrumentality of the state. *Chalfant, supra,* 574 F.2d 739. Several district courts have already held fire protection to be a public function amounting to state action. *Everett v. Riverside Hose Co.,* 261 F.Supp. 463 (S.D.N.Y.1966); *Williams v. Rescue Fire Co.,* 254 F.Supp. 556 (D.Md.1966). Although these cases involved racial discrimination we find their logic equally persuasive here.

The Connecticut statute authorizing agreements with volunteer fire departments implicitly recognizes that fire-fighting is essentially the exclusive function of government, but a function which may be delegated to a volunteer group by agreement. Furthermore, Connecticut by statute grants to volunteer firemen certain powers traditionally associated with sovereignty. Thus, an officer of the MVFD has the authority to direct any person to leave any building or place in the vicinity of a fire on penalty of fine or imprisonment. Conn.Gen.Stat. § 7–313b. In addition, the Department has the statutory authority annually to inspect state-owned buildings within the jurisdiction. Conn.Gen.Stat. § 7–313d. The Department is far from a private club.

Finally, it is significant that many of the cases cited by the appellee to support the necessity for a nexus between state involvement and the challenged action suggests that a different result might obtain in the case of a fire department. *See, e. g., Jackson v. Metropolitan Edison, supra,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477; *Lefcourt v. Legal Aid Society,* 445 F.2d 1150 (2d Cir. 1971); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968).[11]

9. In *Evans v. Newton,* the Supreme Court distinguished between social clubs "and other like organizations in the private sector," and entities such as "a fire department or police department that traditionally serve[ ] the community." 382 U.S. at 301–02, 86 S.Ct. at 490. Although the Court has recently suggested that the finding of state action in *Evans v. Newton* did not truly rest on the public function theory, *Flagg Bros., supra,* 436 U.S. at 159 n.8, 98 S.Ct. 1729, it has never repudiated the notion that where an otherwise private entity fulfills a function traditionally performed exclusively by the state the actions of that entity will be considered actions of the state.

10. *Perez* did not rely wholly on the public function doctrine, finding a *Burton* interdependence and a nexus as well. 499 F.2d 761, 765–66 (2d Cir. 1974). In *United States v. Wiseman,* 445 F.2d 792, 796 (2d Cir. 1971) (a criminal case under 18 U.S.C. § 242), we relied entirely on the public function theory to find state action "under color of law."

11. The functions involved in the various cases cited by the appellee to support the need for a nexus are distinguishable. The appellee relies, for example, on *Lefcourt, supra.* In *Lefcourt,* however, we noted that although such activities as "representation of indigent persons accused of criminal activity" are "among the most significant functions that any agency . . . might be called upon to perform," the legal representation of criminal defendants is not traditionally the function of the state but, on the contrary, is "normally performed for and by private persons." *Id.* at 1156. Similarly, in *Graseck v. Mauceri,* 582 F.2d 203 (2d Cir. 1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979), we held that legal aid is fundamentally private even though a statute authorized the county to meet its obligation to provide counsel by using private legal aid systems. These cases implicitly recognize that when the government provides for legal services, it is not delegating a public function but is instead insuring that citizens have the benefit of a constitutionally guaranteed *private* function.

In view of the circumstances, and in light of the exclusively governmental nature of the function performed by the MVFD, we hold that the actions of the Department were "state action" and that its disciplinary actions may not offend the First Amendment.

### THE FIRST AMENDMENT CLAIM

The District Court believed that the interview with the reporter resulting in the newspaper story criticizing the Department was the only exercise of free speech by appellant. It accordingly considered the other incidents including the proposed letter to the IRS, the cover letter to the First Selectman, and the various communications to the Chief and the executive committee as outside First Amendment protection. It treated these expressions simply as part of a "pattern of conduct" which justified dismissal exclusive of the interview with the newspaper. The court relied on *Mt. Healthy City School District Bd. of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), to rule that there were accordingly reasons for dismissal independent of any First Amendment rights, and that these reasons were sufficient to sustain the dismissal even if First Amendment rights were also involved, since the newspaper interview simply added to an existing pattern of conduct.

We hold, on the contrary, that the episode of the letter to the IRS, of the threatened lawsuit by appellant, of the communication to the First Selectman of the Town, as well as the newspaper interview, come within the general protection of the First Amendment. The first five specifications of the reasons for dismissal which involved dereliction of duty, see footnote 4, *supra,* were not addressed by the District Court; however, there is no finding that they were supportable in fact as a legitimate ground for dismissal.

Hence, we cannot rely on the doctrine of *Mt. Healthy* in this case. Nevertheless, treating the various exercises of speech by appellant as the true grounds for his dismissal, we apply the balancing test proposed in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and hold, on these particular facts, that the dismissal involved no constitutional violation.

*Pickering, supra,* rejected an absolute application of the First Amendment to the speech of public employees. Though a public employee does not lose his right to free speech by becoming a public employee, not all restraints on such speech are unreasonable. The Court said:

"[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with the regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interest of the [public employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Id.* at 568, 88 S.Ct. at 1734–35.

The Court thus left open for case-by-case decision the duty of reconciling the interest of the "whistle blowers" who, in good conscience, seek to expose inefficiency and corruption in government with the interest of the governmental employer whose daily functioning in some cases demands performance without personal friction.

To help resolve the issue, we were given guidance in *Pickering* in the following *negative* terms which applied to that particular appellant and which supported the decision that his right to free speech had been violated:

The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or *harmony among coworkers* is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the Superintendent are not the kind of close working relationships

for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. 391 U.S. at 569–70, 88 S.Ct. at 1735 (emphasis added).

The Court added a further *caveat* in *Givhan v. Western Consolidated School,* 439 U.S. 410, 99 S.Ct. 693, 696 n.4, 58 L.Ed.2d 619 (1979):

When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the *manner,* time and place in which it is delivered.

(emphasis added).

*Givhan* held that private communications to employers were within the realm of protected speech. Treating the case on appeal as a mixture of public and private speech, we assume that when the relationship of superior and subordinate "is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them" *Pickering, supra,* 391 U.S. at 570 n.3, 88 S.Ct. at 1735 n.3, the balance tips against the employee.[12]

In applying these guidelines we distinguish between the rights of a school teacher who expresses views essentially as a citizen and for whom the target is the institution or proposition rather than the person or where the person attacked is far removed from the situation (*Pickering; Givhan, supra*) and a fireman who attacks verbally the very persons with whom he must function in the closest coordination.[13] When lives may be at stake in a fire, an *esprit de*

*corps* is essential to the success of the joint endeavor. Carping criticism and abrasive conduct have no place in a small organization that depends upon common loyalty— "harmony among coworkers," *Pickering, supra,* 391 U.S. at 570, 88 S.Ct. 1731.

The District Judge, after conducting a three-day trial, found that the appellant pursued his " 'attack' against the Department . . . in the most provocative and divisive manner possible."

After observation of appellant on the witness stand Judge Burns found that it was appellant's "intention to change the operation of the Department and undermine the authority of its officers," despite his protestations that his motive was simply to advance the efficiency of the Department and that he had no personal illwill against any of the officers.[14] She also found that "the depth of his resentment at not being given more authority over the ambulance operations and the intensity of his bitterness toward individual senior officers and members was both misplaced and unrealistic." Her conclusion was that "the plaintiff emerges as one more concerned with proving himself right and every one else wrong than with truly promoting the welfare and efficiency of the Department."

We cannot say that these findings were clearly erroneous. Indeed, the internal evidence, even without viewing the demeanor of appellant, points to the same conclusion. The appellant's use of threats and his impatience with the process of investigation and correction threatened institutional efficiency "by the manner, time and place in which it [was] delivered." *See Givhan, supra,* 99 S.Ct. at 696 n.4.[15]

---

12. "[T]here may be limits on the extent to which an employee in a sensitive or policymaking position may freely criticize his superiors and the policies they espouse. *See Pickering v. Board of Education,* 391 U.S. 563, 570 n.3, [, 88 S.Ct. 1731, 20 L.Ed.2d 811]." *Abood v. Detroit Board of Education,* 431 U.S. 209, 238 n.27, 97 S.Ct. 1782, 1797 n.27, 52 L.Ed.2d 261 (1977).

13. Though appellant did not mention them by name, the innuendo is clear since so few persons could have been meant.

14. Judge Burns noted that, before presenting the IRS ultimatum letter, the plaintiff made no effort to either ascertain the likelihood of the IRS pursuing criminal sanctions or to learn the status of Executive Committee action on the April report.

15. The Fourth Circuit has said that a public employee "does not immunize himself against loss of his position simply because his non-cooperation and aggressive conduct are verbalized." *Chitwood v. Feaster,* 468 F.2d 359, 360–61 (1972). Although *Chitwood* preceded

In this state of affairs it would be folly to presume that the functioning of the voluntary fire department would not be seriously impaired if appellant were reinstated by an order of a court. The baleful glance, the hostile look, and the positive distaste for the trouble-maker on the part of his fellow volunteers, coupled with the lingering resentment on the part of appellant himself at not being given the authority he sought, would hardly invoke the comradeship that makes a fire-fighting unit successful.[16]

■ We conclude, therefore, that the District Court was right in denying injunctive relief and in dismissing the action.

## VAGUENESS AND OVERBREADTH ARGUMENT

Appellant argues finally that Rule 13 of the MVFD By-laws is vague and overbroad and that his dismissal based upon its alleged violation is therefore invalid. He contends that he was also dismissed because of an unwritten rule of the Department "whereby members are prohibited from making public statements expressing opinions about the Department without prior approval within the Department." (Appellant's Brief p. 31).

Though there was a theoretical discussion of an "unwritten rule" during the cross-examination of Chief St. John, it was nowhere stated as the specific ground for the dismissal of appellant. In any event, it was apparently understood by all as a gloss on the meaning of Rule 13.

The Chief did specifically rely, however, on a found violation of Rule 13 which proscribes "unbecoming conduct detrimental to the welfare or good name of the Depart-ment." Appellant mounts a dual attack on the rule: first, that it is so vague as to be incomprehensible to the average person in defining prohibited conduct; and second, that since it may violate First Amendment rights it is overbroad.

The vagueness doctrine is based on "notions of fair notice or warning." *Smith v. Goguen,* 415 U.S. 566, 572, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court held that the statute, 5 U.S.C. § 5701, authorizing removal or suspension without pay "for such cause as will promote the efficiency of the service" "is constitutionally sufficient against the charges both of overbreadth and of vagueness," *id.* at 159, 94 S.Ct. at 1647, though the Court acknowledged that "[t]he phrase 'such cause as will promote the efficiency of the service' as a standard of employee job protection is without doubt intended to authorize dismissal for speech as well as other conduct." *Id.* at 160, 94 S.Ct. at 1647.

We think the conduct proscribed in Rule 13 is, in its generality, analogous to the Civil Service regulation in *Arnett.* We note that *Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 578–79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), is of similar import. Here appellant received specific warning from the Chief before he embarked upon further conduct that he must have realized would have been considered contumacious of expected decorum.[17] Rule 13, as applied in this case, gave appellant fair notice.[18]

---

*Givhan,* the Fourth Circuit has recently found its rationale to be unchanged. *English v. Powell,* 592 F.2d 727, 732 at n.5 (1979).

16. We limit our analysis to First Amendment claims. We pass no judgment on questions arising from racial discrimination which involve additional considerations not here relevant. Thus, while we equate free speech with racial discrimination for purposes of state action analysis, we do not necessarily imply that the same equation must govern on the issue whether there has been a *violation* of diverse constitutional rights such as are involved in a racial context for example.

17. The most convincing evidence against appellant's vagueness challenge is his letter to a friend (the "Dundas letter") written prior to launching his attack with the April Report. There appellant not only admitted that he could be "thrown out or shot" for his conduct, but that he intended to cause the ensuing disruption. In particular he stated that he would "fry" a superior officer, Deputy Chief Richard Nicol.

18. In reaching this conclusion, we do not pass on the question of whether a similar regulation might be vague in the absence of notice to the plaintiff. *See, e. g., Bence v. Breier,* 501 F.2d

In sum, appellant clearly had knowledge that his pattern of conduct, his "attack", would be disruptive and detrimental to the Department and his standing in it. He had warning from a friend, from the Chief of the Department and from his suspension. Moreover, he admitted from the start that he knew that his membership in the Department would be in jeopardy. His present assertion of a lack of warning, under these circumstances, is untenable.

That, of course, leaves the question whether the rule was "overbroad" in constitutional terms because of its impact on speech.

We do not find an overbreadth here for the reasons given in *Arnett v. Kennedy* which also involved a First Amendment claim. The Court there held "that the language 'such cause as will promote the efficiency of the service' in the Act excludes constitutionally protected speech, and that the statute is therefore not overbroad." 416 U.S. at 162, 94 S.Ct. at 1648. We follow this rationale.[19] The By-law does not make freedom of expression its substantial target[20] nor is there any satisfactory way of severing the By-law's constitutional from its unconstitutional applications. *See* Tribe, American Constitutional Law § 12–24 (1978). There is no formula by which the non-protected area for governmental employees set forth in *Pickering v. Board of Education, supra,* or in *Meehan v. Macy,* 129 U.S.App.D.C. 217, 230, 392 F.2d 822, 835, *modified,* 138 U.S.App.D.C. 38, 425 F.2d 469, *aff'd en banc,* 138 U.S.App.D.C. 41, 425 F.2d 472 (D.C. Cir. 1969), can be defined with specificity. Since the By-law in question involves conduct rather than speech its overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973). We have held that the By-law as applied to appellant did not violate his right to free speech. And we hold that the By-law proscribing certain general conduct of state employees is not the kind of statute or by-law primarily addressed to speech which so substantially chills the legitimate speech of others as to allow this appellant to claim on their behalf that the By-law is overbroad.[21]

The judgment is affirmed.

1185, 1193 (7th Cir. 1974), in which the court found a regulation similar to Rule 13 to be unconstitutionally vague but distinguished cases in which the particular plaintiff had notice that his conduct violated the challenged regulation.

**19.** Since five justices agreed (Powell and Blackmun, JJ., concurring), we are bound by this formulation as a *ratio decidendi.* We note that Mr. Justice Marshall, dissenting, urged that the statute should have been held an overbroad restriction on the rights of free expression of civil servants.

**20.** It is significant that most of the cases on which the appellant relies involved statutes or regulations specifically directed at speech. *See, e. g., Gasparinetti v. Kerr,* 568 F.2d 311 (3d Cir. 1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978) (regulation prohibiting police officers from commenting unfavorably on official actions of officers or the department); *Muller v. Conlisk,* 429 F.2d 901 (7th Cir. 1970) (regulation prohibiting " 'any activity,

conversation, deliberation, or discussion which is derogatory to the [Chicago Police] Department or any member or policy of the Department' "); *Haurilak v. Kelley,* 425 F.Supp. 626 (D.Conn.1977) (regulation prohibiting critical statements by police officers). *Keyshian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), also cited by the appellant, concerned a regulation which expressly referred to conduct and speech.

**21.** As Judge Leventhal noted in *Waters v. Peterson,* 161 U.S.App.D.C. 265, 273, 495 F.2d 91, 99 (D.C. Cir. 1973):

While the problem of overbreadth in the public employment sphere can raise First Amendment questions, *see Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), it does not necessarily require the same remedy as overbreadth in criminal statutes . . . . Deterrence of legitimate speech must be minimized by proper application of the prohibition to activity not protected by the First Amendment.