Scott GOLDSTEIN

v.

**THE CHESTNUT RIDGE VOLUNTEER FIRE COMPANY, et al.**

**Civil No. JFM–96–1483.**

United States District Court,
D. Maryland.

Nov. 13, 1997.

Charles Grant Byrd, Jr., Brown, Alston & Byrd, Baltimore, MD, for Plaintiff.

Roger N. Powell, Pikesville, MD, Jo Anna Schmidt, Baltimore, MD, for Defendant.

MEMORANDUM

MOTZ, Chief Judge.

Plaintiff, Scott Goldstein, has brought this action under 42 U.S.C. § 1983 against defendants The Chestnut Ridge Volunteer Fire Company and members of its Executive Committee (collectively "Chestnut Ridge" or "the Fire Company"). Plaintiff alleges that he was disciplined, suspended, and ultimately discharged for informing Chestnut Ridge that several of its members lacked necessary training and qualifications. Plaintiff claims that these actions violated his First Amendment rights.

Chestnut Ridge has moved for summary judgment on the ground that it is not a "state actor" under the Fourteenth Amendment so that its actions cannot be deemed to be "under color of state law" under section 1983. Goldstein has filed a cross motion for summary judgment on the same issue.

## I.

The courts have derived three tests for determining if particular conduct by a private entity constitutes state action: (1) the symbiotic relationship test, (2) the regulation/public funding test, and (3) the public function test. *See generally Conner v. Donnelly,* 42 F.3d 220, 223–24 (4th Cir.1994). In *Haavistola v. Community Fire Co. of Rising Sun,* 6 F.3d 211, 215–16 (4th Cir.1993), the Fourth Circuit ruled that the symbiotic relationship test applies only where a private entity is a lessee of public property, and that in Maryland volunteer fire departments are not so extensively regulated as to become state actors. Therefore, the question narrows to whether Chestnut Ridge can be deemed to be a state actor under the public function test.

In applying this test it is not sufficient merely to ask "whether a private group is serving a 'public function.' ... the question is whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 455, 42 L.Ed.2d 477 (1974)). This question is not always easy to answer. As noted by the Fourth Circuit in *Haavistola,*

> [r]eview of the ... precedents and decisions does little to simplify the issue of when a private entity assumes the role of state actor due to its involvement or provision of an exclusive public function. The cases inform the analysis in two ways: first, the determination is a factually intense analysis; and second, its outcome hinges on how a given state itself views the conduct of the function by the private entity.

6 F.3d at 218.

The district court in *Haavistola* had granted summary judgment for the defendant, finding that "nothing ... indicates that firefighting has traditionally been the *exclusive* province of the State of Maryland." 812 F.Supp. 1379, 1396 n. 20 (D.Md.1993). The Fourth Circuit reversed this ruling, holding

that the district court had erred by making its determination "without any direct evidence as to how fire protection is conducted throughout the State" and in taking judicial notice "of the facts that many volunteer fire departments operate in Maryland without governmental intervention at all and that all volunteer fire departments operate in a gray area as to the function they provide." 6 F.3d at 218.

After remand a trial was conducted in *Haavistola* and the jury returned a verdict finding that the Community Fire Company of Rising Sun was not a state actor. The plaintiff did not take an appeal. Thereafter, the Fourth Circuit reversed and remanded for trial a decision I rendered in an earlier case brought against Chestnut Ridge in which I held that the Fire Company was a state actor as a matter of law. *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 25 F.3d 1039, 1994 WL 233356 (4th Cir.1994) (*"Goldstein I"*). In a separate concurring opinion Chief Judge Wilkinson expressed his view that the state action issue should be resolved as a matter of law. Chief Judge Wilkinson further indicated that if the issue is to be treated as a question for the fact finder, the verdict reached by the *Haavistola* jury should be accorded respect and that "a significant burden should rest with any party seeking to depart from that [verdict]."[1] 1994 WL 233356 at *4.

## II.

For the reasons that follow I again find that Chestnut Ridge is a state actor as a matter of law. I realize that my ruling could be considered an obstinate refusal to follow the Fourth Circuit's precedent; I hope that it is not interpreted as such. I must confess that I do fully subscribe to Chief Judge Wilkinson's view that a myriad of considerations, including predictability, the absence of any underlying genuine disputes of fact, and proper regard for the respective roles of judges and juries, makes the state action issue one which is appropriate for resolution by summary judgment. Nonetheless, if the

---

1. The earlier case was instituted by Ivan Goldstein, the father of the plaintiff in the present action. The case was voluntarily dismissed by the plaintiff after remand.

record in the present case was precisely the same as in *Goldstein I*, I would, of course, submit the issue to the jury. However, historical evidence which has been added to the record has further clarified the question and reinforced the conclusion I previously reached.[2]

### III.

#### A.

Chestnut Ridge is a non-profit corporation operating under its own constitution and by-laws. It owns the land and building from which it operates as well as all of the engines, hoses, and related equipment it employs in fire suppression and rescue activities. It elects its own officers and directors. Those officers are charged with the duty of maintaining discipline and taking personnel actions necessary for the preservation of good order and morale within the company.

Career and volunteer fire companies in Baltimore County are dispatched to fire scenes by a central county dispatcher. The factors considered by the dispatcher in determining whom to call are the location and severity of the fire or emergency event. At the fire scene, volunteer fire companies are sometimes in command over career fire companies, while on other occasions career and volunteer fire companies share command at the scene.

Chestnut Ridge (like all volunteer fire companies in Baltimore County) is a member of the Baltimore County Volunteer Fire Association ("BCVFA"). The BCVFA requires that volunteer firefighters have certain types of certification and/or training before they fight a fire in the county. These are the same types of certification and training that the Baltimore County Fire Department requires of its career firefighters. If a volunteer fire company's members fail to meet

those requirements, the volunteer company will be suspended from the BCVFA. If the volunteer fire company is suspended, the Baltimore County Fire Department will take the volunteer fire company off its dispatch system and will not dispatch that volunteer fire company to fight any fires in the county.

#### B.

Article 38A, section 7 of the Maryland Code establishes the Office of the Fire Marshal, whose responsibilities include "the establishment and enforcement of fire safety practices throughout the State, preventive inspection and correction activities, coordination of fire safety programs with volunteer and paid fire companies, and other State agencies and political subdivisions exercising enforcement aspects, and critical analysis and evaluation of Maryland fire loss statistics for determination of problems and solutions." Md. Ann.Code art. 38A, § 7(b) (1997). In addition, the Maryland State Firemen's Association, a state-funded association, conducts annual inspections of all fire and rescue apparatus, equipment, and facilities. Md. Ann. Code art. 38A, § 46B.

State-funded training is required for volunteer fire company members, and is conducted by the Maryland Fire and Rescue Institute at the University of Maryland, a state institution. Md.Code Ann., Educ. § 13–103 (1997). Volunteer fire companies and their personnel are immune from civil liability for acts taken in the performance of their duties. Md.Code Ann., Cts. & Jud. Proc. §§ 5–309, 5–309.1 (1995). Chestnut Ridge's ambulance service is required to be licensed under section 13–515 of Maryland's education code. State grants and loans to volunteer fire companies, including Chestnut Ridge, are made through the Emergency Assistance Trust Fund and approved and monitored by State agencies. Md. Ann.Code art. 38A, § 46A.

---

**2.** I should add that I feel somewhat responsible personally for having contributed to the perplexing current state of the law. In *Goldstein I* I wrote only a letter opinion, summarily stating my conclusion that firefighting is a public function. I did not give the issue the careful treatment it deserves. In any event, if I have not been faithful to Fourth Circuit precedent, my waywardness should be promptly corrected. Accordingly, in

the order accompanying this opinion, I expressly state (so that Chestnut Ridge may seek an interlocutory appeal pursuant to 28 U.S.C. § 1292(b)) that my ruling involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation.

Volunteer fire departments, including Chestnut Ridge, receive significant portions of their operating revenue from the State of Maryland. For example, Chestnut receives State funding that is appropriated by the State to promote:

(1) The delivery of effective and high quality fire protection, rescue, and ambulance services to the citizens of this State;

(2) Increased financial support for fire, rescue, and ambulance companies by local governments; and

(3) The continued financial viability of volunteer fire, rescue, and ambulance companies given the greatly increased costs of apparatus and other types of equipment.

Md. Ann.Code art. 38A, § 45B. Payments under this statute are made to each county for distribution to fire companies for the purchase of equipment and rehabilitation of facilities. *Id.* Funds distributed to fire companies under this statute are conditioned upon compliance with a requirement that they be audited and copies of the account be submitted to a State agency. Md. Ann.Code art. 38A, §§ 45C–D. Chestnut Ridge receives operating revenue from the State and Baltimore County governments, and uses these funds for items such as insurance, utilities and fuel.

Under Maryland and Baltimore County law, grants and loans are also provided for volunteer fire companies. *See, e.g.,* Baltimore County Code §§ 15–161 *et seq.* (1988). Members of volunteer fire companies are covered under State and county benefit plans. *See, e.g.,* Md. Ann.Code art. 38A, §§ 42–42B (disability benefits); Md.Code Ann., Lab. & Empl. § 9–234 (1991 & Supp. 1996) (workers' compensation); Md. Ann. Code art. 48A, § 425 (1994) (group life insurance); Baltimore County Code § 23–147 (pensions). Volunteer firefighters are considered on duty for purposes of the Public Safety Officer's Benefit Act. Md. Ann.Code art. 38A, § 45. Volunteer fire companies and firefighters receive several tax benefits and exemptions, *see, e.g.,* Md.Code Ann., Tax–

Prop. § 7–209 (1994), and are exempt from paying State and county fees that other private corporations are required to pay. Md. Code Ann., Corps. & Ass'ns § 1–203.1 (1993).

## IV.

### A.

■ Although the foregoing facts demonstrate that in Maryland volunteer fire departments are extensively regulated by the State and that they and their members receive substantial financial benefits from the State, these facts alone clearly would not entitle me to hold that Chestnut Ridge is a state actor. Virtually the same facts were before the Fourth Circuit in *Haavistola* and *Goldstein I* when the court remanded the cases for trial on the state action issue.

The factor that I now find decisively tips the balance in favor of finding that Chestnut is a state actor is the existence of two Maryland statutes which confer inherently sovereign powers upon volunteer firefighters. Under Article 48, section 181(a), volunteer fire companies are given the authority to enter buildings where a fire is in progress, to order any person to leave the building, to order caravans of vehicles, crafts or railway cars to be detached, and to maintain order in the vicinity of a fire or other emergency.[3] Likewise, members of volunteer fire companies may be appointed "fire police" with the powers of deputy sheriffs, including the power to arrest, while at fires and on their way to and from fires. Maryland Ann.Code art. 87, § 49 *et seq.* (1991 & Supp.1994).

Can there be any doubt that the exercise of the powers to enter buildings, order persons to leave buildings, make arrests, and commandeer private vehicles is "traditionally the exclusive prerogative of the State?" *Rendell–Baker v. Kohn,* 457 U.S. at 842, 102 S.Ct. at 2772. Indeed, to the extent that it is not sanctioned by the State, the performance of such acts would be a crime. Could there be any more clearly definitive guiding line?[4]

---

**3.** An individual who obstructs a fire investigation or refuses to remove combustible materials is subject to criminal penalties. Maryland Ann. Code art. 48, §§ 181(b), 182 and 183.

**4.** The Second Circuit, in *Janusaitis v. Middlebury Volunteer Fire Dep't,* 607 F.2d 17 (2d Cir.1979), also recognized the importance of this conferral of power upon volunteer firefighters. In con-

## B.

The parties in the present case have placed in the record more historical information than was presented in *Goldstein I*. The information is of interest. Goldstein has submitted a report and affidavit from Whitman Hawley Ridgway, a tenured history professor at the University of Maryland, in which Professor Ridgway concludes "within a reasonable degree of Maryland historical certainty and probability that fire fighting was traditionally an exclusive public function in Baltimore County, Maryland." Professor Ridgway supports his opinion by reference to various historical facts. First, prior to 1881 organized fire protection in the most populous area of Baltimore County, known as "the Belt," had (with one exception) depended upon the services of Baltimore City units from contiguous areas. Second, in 1881 the Baltimore County Fire Department was established. Third, the Waverly Fire Company, the exception just noted, which had been created in 1878 when the county financed the construction of its building and the purchase of its fire equipment, turned over its property to the county's Fire Commissioner when the County Fire Department was established in 1881. Finally, in the years after its establishment the County Fire Department rapidly grew.

Although Chestnut Ridge has not come forward with historical testimony opposing the opinion of Professor Ridgway, I do not find the professor's opinion to be dispositive. He has not presented any evidence discussing firefighting practices in the county prior to 1881 beyond the area known as the Belt.

Moreover, one of the works upon which Professor Ridgway relies, a history of firefighting in Baltimore County, documents that after the turn of the century, "while the growth of the county's paid department slowed, volunteer fire companies were enjoying a boom period." Betsy Weaver & Gary E. Frederick, *Hands, Horses and Engines* 35 (1982). Over fifteen volunteer companies were formed soon after the turn of the century. *Id.* at 35–44.

On its face this evidence not only seems to contradict to some extent Professor Ridgway's conclusion, it could be viewed as definitively establishing that in Baltimore County firefighting has *not* traditionally been the exclusive prerogative of the State. Over time, however, there have been other developments, statutory in nature, which (although not referred to by Professor Ridgway) are of significant historical importance. In 1922, members of Baltimore County fire companies, both volunteer and paid, were authorized to be appointed deputy sheriffs. Act of Apr. 13, 1992, ch. 414, 1922 Md. Laws 907. The firefighters were to exercise their deputy powers both at fires and on route to and from fire calls. This statute was later extended to firefighters in other Maryland counties and its present version is, as recited above, found at Md. Ann.Code art. 87, § 49 *et seq.* Further, in 1973, volunteer fire companies in Baltimore County were granted "peacekeeping" authority to enter buildings to fight fires and to maintain order at fire scenes. Act of April 26, 1973, ch. 73, 1973 Md. Laws 134. This statutory authority is, as recited above, now located in Md. Ann. Code art. 48, § 181(a).[5] Since it is the pos-

---

cluding that a Connecticut volunteer fire department was a state actor, the court relied in part on several statutes that "grant[ed] to volunteer firemen certain powers traditionally associated with sovereignty," including the power to maintain order at fire scenes. *Id.* at 24.

5. There are interesting anomalies in the legislative history of the statutes defining the powers of Maryland's volunteer firefighters. In 1929, volunteer fire companies throughout the state, except Baltimore County, were granted the power to conduct inspections for fire hazards. Act of Apr. 11, 1929, ch. 260, 1929 Md. Laws 780. Even today the Baltimore County Fire Department has exclusive authority within the county to conduct such inspections although volunteer fire

companies throughout the rest of the state have retained that power in their jurisdictions. Md. Ann.Code art. 38A, § 181(a). Likewise, some of the "peacekeeping" powers that were not granted to volunteer fire companies in Baltimore County until 1973 were conferred upon volunteer fire companies throughout the remainder of the state in 1951. Act of Apr. 13, 1951, ch. 372, 1951 Md. Laws 1119. In contrast, the authorization granted in 1922 to members of Baltimore County volunteer fire companies to be appointed deputy sheriffs was only extended to other firefighters in the state starting in 1945. *See, e.g.,* Act of Mar. 24, 1945, ch. 375, 1945 Md. Laws 346 (Washington County). None of these anomalies affect the conclusion I have reached.

session and exercise of these powers that I find to be the traditional prerogatives of the State, whatever the status of volunteer fire companies in Baltimore County may have been prior to 1922 or 1973, I am of the firm opinion that they are now state actors.

### C.

In reaching the conclusion that I have I am acutely aware of the care with which courts have circumscribed the state action doctrine. For example, the Supreme Court has held that a utilities company, a nursing home and a private secondary school are not state actors. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). Similarly, the Fourth Circuit has held that a private, non-profit corporation that organizes and promotes an annual municipal festival is not a state actor. *See United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902 (4th Cir.1995). The caution reflected in these opinions is entirely appropriate. The line between public and private activity cannot be clearly defined and, if promiscuously applied, the public function test could encompass within section 1983 and the Fourteenth Amendment various activities conducted by private entities, including education and health care, which, although proper subjects of regulation and funding, traditionally have not been solely within the province of the State.

Firefighting, however, is an activity of an entirely different nature. No reasonable person living in today's society would suggest that providing protection from fire, at least in a populated urban or suburban setting, has not become one of the fundamental responsibilities of government, which requires for its proper performance the conferral of the most fundamental police powers

upon firefighters. While that responsibility may be delegated, the body politic would not permit it to be devolved to private enterprises. As one thoughtful commentator has noted, if the public function test excludes volunteer fire companies from the category of persons who are deemed to be state actors, the test requires reformulation or recasting. *See* Ronald J. Krotoszynski, *Back To The Briarpatch: An Argument In Favor Of Constitutional Meta–Analysis In State Action Determinations,* 94 Mich. L.Rev. 302, 328–32 (1995). Perhaps purists will reach the conclusion that this is what is necessary. A far easier solution is for the courts simply to apply the existing test in a sensible manner.

### V.

█ There is a remaining issue to be considered. In *Blum v. Yaretsky*, 457 U.S. at 1011–12, 102 S.Ct. at 2789–90, the Court, after rejecting the contention that the defendant, a nursing home, provided a public function, went on to state:

> Even if respondents' characterization of the State's duties were correct, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public. Indeed, respondents make no such claim, nor could they.

Under this reasoning a private party could be considered a state actor for those decisions that directly affect the public, yet escape liability under § 1983 for internal administrative decisions.

There has been surprisingly little discussion of *Blum's* statement in subsequent cases.[6] Several Fourth Circuit cases have mentioned this aspect of the decision, however, providing some insight into its potential effect on state action analysis. In *Hicks v. Southern Maryland Health Systems Agency,*

---

**6.** There has also been little academic commentary on the subject. In one of the few discussions of the issue, one commentator noted that "the *Blum* decision for the first time specifically couched the public function test in nexus terms. Such language may indicate that the public function test now requires not only scrutiny of the

precise nature of the activity being challenged, but also some nexus between the state and that activity." Ronna G. Schneider, The *1982 State Action Trilogy: Doctrinal Contraction, Confusion, and a Proposal for Change,* 60 Notre Dame L.Rev. 1150, 1176–77 (1985).

737 F.2d 399, 402 (4th Cir.1984), the court, in rejecting a finding of state action under a public function theory, stated that "the court in *Blum* restricted its application to cases where the state traditionally and exclusively had assumed day-to-day administration." More recently, in *Gaston Festivals* the court cited *Blum's* language while discussing what constitutes a governmental decision covered by section 1983. 43 F.3d at 911. Perhaps most importantly, however, in *Haavistola* the court, in describing the parameters of the public function analysis, stated that *Blum* "suggested that the analysis should involve review of the alleged misconduct, and not just the overall function of the alleged state actor." 6 F.3d at 216.

In at least one other case, however, the Fourth Circuit has seemingly rejected applying *Blum's* reasoning in this sort of situation. In *Andrews v. Federal Home Loan Bank of Atlanta*, 998 F.2d 214, 216 (4th Cir.1993), the plaintiff was terminated as a field examiner for the defendant. Plaintiff filed suit, alleging that he was fired for criticizing a change in the defendant's asset-classification policy, in violation of the First Amendment. *Id.* In considering whether the defendant was performing a public function, the court stated:

> The district court identified personnel decisions as the function at issue. It then held personnel decisions not to constitute a public function. While we would not differ with that characterization, we think that the Bank's status as a governmental entity is what the parties contest for purposes of state action doctrine. If the Bank were held to be performing a public function for purposes of state action doctrine, then it would be difficult to conclude that personnel decisions reached during the performance of that public function were not subject to constitutional strictures.

*Id.* at 219 n. 1. Thus, unlike the "piecemeal" approach to state action analysis seemingly endorsed by *Blum*, in *Andrews* the court adhered to a "unified" approach, in which even internal administrative decisions made by a private party can give rise to section 1983 liability, if the party performs a public function.

In my judgment the dictum in *Blum* is sound. Even if a defendant is deemed to be a state actor, a second inquiry should be made as to whether the conduct at issue in the litigation peculiarly relates to the defendant's performance of a public function. Under this approach a routine employment decision, alleged to have been motivated by unlawful discriminatory animus (such as the decisions involved in *Haavistola* and *Goldstein I* ), would not be actionable under section 1983 (although it would, of course, be actionable under other anti-discrimination statutes, such as Title VII, the Age Discrimination in Employment Act, and, where it applies, section 1981).

That limiting doctrine is of no help to Chestnut Ridge in this case, however. Plaintiff alleges that he was disciplined, suspended, and terminated for informing Chestnut Ridge that several of its members lacked necessary training and qualifications. Clearly, these alleged communications directly related to the public function which Chestnut Ridge performs. Accordingly, adverse employment actions taken in reaction to them fall within the purview of section 1983.

A separate order effecting the rulings made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herein on August 21, 1997 and in the memorandum to counsel being entered herewith, it is, this 13th day of November 1997

## ORDERED

1. Defendants' motion for summary judgment is denied;

2. Plaintiff's motion for summary judgment is denied on the ground that ultimate resolution of the cognizability of this action under 42 U.S.C. § 1983 will turn upon the merits of the reasons that plaintiff was disciplined, suspended, and terminated;

3. Defendants' motion to alter or amend judgment is granted in part and denied in part; and

4. Pursuant to 28 U.S.C. § 1292(b), I state, so that the defendants may, if they choose, seek to take an interlocutory appeal, that I am of the opinion that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.