

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-16-1995

# Gorman vs. Twnshp Manalapan

Precedential or Non-Precedential:

Docket 94-5200

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Gorman vs. Twnshp Manalapan" (1995). *1995 Decisions.* Paper 57.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/57

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 94-5200

———————


ALPHONSE W. GROMAN; JANE M. GROMAN,
                                    Appellants

v.

TOWNSHIP OF MANALAPAN;
CHIEF JIMMIE R. POTTS; HELEN K. KIRKLAND;
THOMAS WHITE; MATTHEW TREMBOW; PETER VANDERWEIL;
JOHN DOE, RICHARD ROE, Police Officers of the
Township of Manalapan, the identity and number
of whom is presently unknown to the plaintiffs;
ENGLISHTOWN-MANALAPAN FIRST AID SQUAD;
EDWARD T. MORIARTY; TRACIE ZACHARY;
JANE A. DOE, JOHN A. DOE, JOHN B. DOE, JOHN C. DOE,
JANE B. DOE, and JANE C. DOE, fictitious defendants
(representing unlimited fictitious defendants);
ABC CO., and XYZ COMPANY, a fictitious entity
(representing unlimited fictitious defendants)


———————————————————————————————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 92-cv-00708)

———————————————


Argued September 27, 1994

Before:  SCIRICA, NYGAARD and McKEE, <u>Circuit</u> <u>Judges</u>

(Filed February 16, 1995)


CHARLES F. WETHERELL, ESQUIRE (Argued)
Meinders & Wetherell
555 Madison Avenue
P.O. Box 900
Lakewood, New Jersey 08701

Attorney for Appellants

DAVID F. LUVARA, ESQUIRE (Argued)
Slimm & Goldberg
216 Haddon Avenue
P.O. Box 2222
Westmont, New Jersey 08108

   Attorney for Appellees
   Township of Manalapan, Chief Jimmie R. Potts,
   Helen K. Kirkland, Thomas White, Matthew Trembow,
   Peter Vanderweil, Thomas Wallace, Evelyn Schade,
   Mary Caccamo, Officer Ascough, Officer Visconi,
   Officer Bruno, Officer McCormick, Officer Rumolo
   and Officer Cochran


MARK T. STOPA, ESQUIRE
Lushan, McCarthy, Goonan & Stopa
284 Harvard Street
P.O. Box 1604
Brookline, Massachusetts 02146

   Attorney for Appellee
   Chief Jimmie R. Potts


STEVEN B. PORTNOFF, ESQUIRE
Law Office of Steven B. Portnoff
26 Plaza Nine
Manalapan, New Jersey 07726

   Attorney for Appellee
   Thomas White


GEORGE WILGUS, III, ESQUIRE (Argued)
Lenox, Socey, Wilgus, Formidoni & Casey
3131 Princeton Pike
Trenton, New Jersey 08648

   Attorney for Appellees
   Englishtown-Manalapan First Aid Squad,
   Edward T. Moriarty, Tracie Zachary,
   James Paulser and Joseph Bokenko

---

OPINION OF THE COURT

---

SCIRICA, <u>Circuit</u> <u>Judge</u>.

Plaintiffs Alphonse W. Groman and Jane M. Groman appeal the district court's grant of summary judgment on their civil rights claims to defendants Township of Manalapan, the Englishtown–Manalapan First Aid Squad, members of the first aid squad and Manalapan Police Department, and several unknown defendants.

The dispute arises out of the arrest of Mr. Groman at his residence on February 17, 1990.  Plaintiffs brought this civil rights action under 42 U.S.C. § 1983 (1988), alleging certain constitutional violations based on: use of excessive force, false arrest, false imprisonment, failure to provide necessary medical treatment, unlawful search and seizure, conspiracy to violate constitutional rights, and denial of right to counsel.[1]

The district court granted summary judgment to all defendants on all constitutional claims and declined to exercise supplemental jurisdiction on the state law claims.  We will affirm on all counts except the claim of excessive force against police officers Helen K. Kirkland, Matthew Trembow, and Peter

---

[1].  Plaintiffs also alleged the following state law claims: trespassing, intentional and negligent infliction of emotional distress, assault, battery, loss of consortium, invasion of privacy, injury to good name and reputation, slander, libel, negligent hiring, and failure properly to train and supervise.

Vanderweil, and the claims of false arrest and false imprisonment against police officer Kirkland.

I.

On February 17, 1990, Alphonse W. Groman and his wife, Jane M. Groman, were in their home in Manalapan, New Jersey, when Mr. Groman, age seventy-five, allegedly suffered a minor stroke. Mrs. Groman telephoned her neighbor, James W. Thomson, who came over with his son, James E. Thomson, and then called the police for first aid. Officer Helen K. Kirkland of the Township of Manalapan Police Department was the first to respond.

When Kirkland arrived at the Groman residence, James W. Thomson and Mrs. Groman were attempting to place Mr. Groman into a chair. Kirkland entered the room and proceeded toward Mr. Groman, who resisted her contact and demanded to go outside. Mr. Groman admitted to consuming one alcoholic drink sometime earlier.

Exactly what happened next is hotly contested. Plaintiffs contend Mr. Groman was standing still, arms to his side, when Kirkland struck him in the mouth. This blow, plaintiffs maintain, was an unprovoked assault against a small elderly man, who, while uncooperative, did not deserve to be struck.[2] Defendants assert Kirkland put a hand on Groman's

---

[2]. Mrs. Groman's testimony at deposition included the following exchange:

> Q: And what happened after you got the chair out?

shoulder in an effort to get him to sit down.  Immediately thereafter Groman punched Kirkland in the face, cutting and bruising her cheek, and began using abusive language.  As he prepared to hit her again, Kirkland responded out of fear for her own safety and hit Groman.  She observed that Groman was combative and that he smelled of alcohol.[3]  According to

(..continued)

> A: I was watching [Mr. Groman] all this time.
> As I say, I backed away, and Officer Kirkland
> looked at [Mr. Groman] and said to him, Do
> you know you hit an officer?
>
> Q: Okay.
>
> A: This is when I came forward with--I guess
> my mouth must have been opened ready to say
> he didn't touch you, because [Mr. Groman] was
> just standing there, his head down a bit, his
> arms to his side, he didn't move an inch, and
> there was no way in hell that he could have
> hit her.

Jane Groman Dep., Plaintiffs' App. at 375.

[3].  Kirkland testified at Groman's state trial to the following:

> Q: What happened after [Mr. Groman] hit you?
>
> A: Well, it seemed that we were going to--he
> was going to hit me again.  I hit the subject
> back and then I grabbed both his hands with
> mine and locked them, and he got up, and he
> was--it was like he was going to fight me
> again.  So I held his hands just like--almost
> like a kid, up in the air, and he was trying
> to bend my hands back . . . .

Kirkland Test., Plaintiffs' App. at 120.  Kirkland also testified:

> Q: Did Mr. Groman do anything beyond his
> striking you that you testified to, ma'am, to
> put you in such fear of your safety?
>
> . . . .

plaintiffs, Groman was a stroke victim, disoriented and a bit aggressive, who was assaulted by a police officer dispatched to assist him. Defendants portray Groman as a violent drunk and claim Kirkland's response was the appropriate reaction to a dangerous situation.

Kirkland called the Manalapan Police Department for backup. Officer Matthew Trembow soon arrived to aid Kirkland and the local first aid squad arrived shortly thereafter, followed by Lieutenant Peter Vanderweil. Members of the first aid squad attempted to provide medical assistance to Groman but he rebuffed them. Groman continued to be belligerent and to curse at the police and first aid squad. The first aid squad members left without treating him.

The police officers proceeded to arrest Groman, but he was not cooperative. After a brief struggle which plaintiffs attribute to Groman's limited mobility in his right arm and defendants to Groman's attempt to resist arrest, the officers placed Groman in handcuffs. As the police took Groman out to the police car, he allegedly sustained an injury to his face and lost his dentures.

Upon arrival at the police station, the officers removed Groman from the car. Here again the parties vigorously dispute what occurred. Plaintiffs maintain, based on Groman's

(..continued)

> A: At this time he had started to stand up,
> and he had had his fist cocked back again.

Kirkland Dep., Plaintiffs' App. at 752.

hazy recollection, that the police officers dragged Groman out of the car feet first causing his head to hit the pavement. After picking him up, the officers stomped on his toe, allowed him to fall again, and then one of the officers jumped on him. Defendant police officers say that as they moved Groman from the police car to the station he fell, knocking his head against the ground, and that Kirkland lost her balance trying to hold Groman up and fell with him. Once inside the police station, plaintiffs contend the officers left Groman handcuffed for some time. The first aid squad was called again, but Groman again refused treatment. Groman's daughter asserts his pants were doused in alcohol when she picked him up from the police station. Plaintiffs maintain that during the course of these events Groman sustained black eyes and minor cuts and bruises to the face and hands. The police charged Groman with aggravated assault, disorderly conduct, and resisting arrest. He was acquitted on all counts after a bench trial in the Manalapan Township Municipal Court.

## II.

We exercise plenary review over the grant of a motion for summary judgment. Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co., 989 F.2d 635, 637 (3d Cir. 1993). We apply the same test required of the district court, viewing the facts from the evidence submitted in the light most favorable to the non-moving party, and taking the non-movant's allegations as true. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert.

denied, 429 U.S. 1038 (1977).  We have jurisdiction over this appeal under 28 U.S.C. § 1291 (1988).

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  After one party has filed a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–52 (1986).  The party contesting the motion must demonstrate a dispute over facts that might affect the outcome of the suit.  Id. at 248.  Plaintiffs contend they have presented sufficient evidence to survive summary judgment.

III.

Section 1983 of 42 U.S.C.[4] does not create substantive rights, but provides a remedy for the violation of rights created by federal law. Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985). A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law. Gomez v. Toledo, 446 U.S. 635, 640 (1980).

A. Claims Against the Police

An excessive force claim under § 1983 arising out of law enforcement conduct is based on the Fourth Amendment's protection from unreasonable seizures of the person. Graham v. Connor, 490 U.S. 386, 394-95 (1989). A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution. Brown v. Borough of

---

[4]. The text of 42 U.S.C. § 1983 provides, in part:

> **§ 1983. Civil action for deprivation of rights**
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Chambersburg, 903 F.2d 274, 277 (3d Cir. 1990). Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force. Edwards v. City of Phila., 860 F.2d 568, 572 (3d Cir. 1988).

When a police officer uses force to effectuate an arrest that force must be reasonable. Graham, 490 U.S. at 396. The reasonableness of the officer's use of force is measured by "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. The reasonableness inquiry is objective, but should give appropriate scope to the circumstances of the police action, which are often "tense, uncertain, and rapidly evolving." Id. at 397.

In this case, summary judgment is appropriate if, as a matter of law, the evidence would not support a reasonable jury finding that the police officers' actions were objectively unreasonable. Without commenting on the weight of the evidence, we believe it could support a finding that Kirkland hit Groman when Groman was suffering from a minor stroke, and that Groman's obstreperous behavior did not warrant Kirkland's reaction. We conclude there are material issues of disputed fact, and that a jury could decide that Kirkland and the other officers acted unreasonably and used excessive force. Further, a jury could find the officers used excessive force in transporting Groman to the police station.

Should a jury decide Groman did not hit Kirkland, then he could have committed only the crimes of disorderly conduct and resisting arrest. In evaluating the Graham factors under the facts of this case, we conclude that neither offense is particularly severe, and that a jury could determine Groman did not present a serious threat to Kirkland. Cf. Frohmader v. Wayne, 958 F.2d 1024, 1025-26 (10th Cir. 1992) (holding summary judgment on excessive force claim inappropriate when plaintiff's sworn account differed from police officer's regarding events after plaintiff's arrest); Wing v. Britton, 748 F.2d 494, 495-96 (8th Cir. 1984) (jury decided excessive force claim when disputed fact was whether plaintiff punched police officer to provoke officer's response).

In sum, we hold only that there are material issues of disputed fact and credibility determinations that cannot be decided on a motion for summary judgment.[5] We will reverse the district court's grant of summary judgment on plaintiffs' excessive force claim against officers Helen K. Kirkland, Matthew Trembow, and Peter Vanderweil.[6]

[5]. This case is distinct from Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990), in which we affirmed the district court's holding that plaintiff's claim was frivolous because it was based on plaintiff's bare assertion of police excessive force, was completely uncorroborated by other evidence, and plaintiff's recollection was dimmed by alcohol. Here, there is some corroboration from Mrs. Groman on the initial altercation and from others on the injuries sustained.

[6]. Of course, the fact that we reverse as to officers Trembow and Vanderweil does not put them in the same posture as Kirkland on remand. Plaintiffs do not allege Trembow and Vanderweil were involved in the initial scrap where Kirkland hit Groman in the house. Thus, plaintiffs will have to prove that Trembow and

Our holding on the excessive force claim does not automatically compel reversal of the grant of summary judgment on plaintiffs' other claims against the police.  To prevail on their false arrest claim, plaintiffs would have to demonstrate at trial that the police lacked probable cause to arrest Groman.  "The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."  <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 141 (3d Cir. 1988).  Groman was charged with aggravated assault,[7] disorderly conduct,[8] and

(..continued)
Vanderweil violated Groman's Fourth Amendment rights by using excessive force during his transport to the police station.

[7].  The New Jersey statute provides in part:

> **2C:12-1.  Assault**
>
>> **a.  Simple Assault.**  A person is guilty of assault if he:
>>
>> (1) Attempts to cause or purposely, knowingly or recklessly causes bodily injury to another;
>>
>> . . . .
>>
>> **b.  Aggravated Assault.**  A person is guilty of aggravated assault if he:
>>
>> . . . .
>>
>> (5) Commits a simple assault as defined in subsection a. (1) . . . of this section upon
>>
>>> (a) Any law enforcement officer acting in the performance of his duties while in uniform or exhibiting evidence of his authority . . . .

resisting arrest.[9]  Generally, the existence of probable cause is (..continued)

N.J. Stat. Ann. § 2C:12-1(a), (b)(5)(a) (West 1982 & Supp. 1994).

[8].    The New Jersey statute provides:

> **2C:33-2.  Disorderly conduct**
>
> **a.  Improper behavior.**  A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
>
> (1) Engages in fighting or threatening, or in violent or tumultuous behavior; or
>
> (2) Creates a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor.
>
> **b. Offensive language.**  A person is guilty of a petty disorderly persons offense if, in a public place, and with purpose to offend the sensibilities of a hearer or in reckless disregard of the probability of so doing, he addresses unreasonably loud and offensively coarse or abusive language, given the circumstances of the person present and the setting of the utterance, to any person present.
>
> "Public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

Id. § 2C:33-2.

[9].    The New Jersey statute provides in part:

> **2C:29-2.  Resisting arrest; eluding officer**
>
> a.  A person is guilty of a disorderly persons offense if he purposely prevents a

a factual issue.  <u>Deary v. Three Un-Named Police Officers</u>, 746 F.2d 185, 191 (3d Cir. 1984).  Summary judgment can be granted in an appropriate case on probable cause, <u>id.</u> at 192, but it is not proper here.  Because we find that a reasonable jury could find that the police did not have probable cause to arrest Groman, we reverse on this count as to police officer Helen K. Kirkland.

In order for the police to have properly arrested Groman, they must have had probable cause on the aggravated assault or disorderly conduct charges.  This is because the resisting arrest charge could not have provided probable cause for the arrest ab initio.  Additionally, should a jury decide that Groman did not hit Kirkland, it could determine that Kirkland lacked probable cause to arrest him on the aggravated assault charge.[10]  We are then left to consider the disorderly conduct charge.

A disorderly conduct charge under § 2C:33-2 requires that the behavior have been in "public."  N.J. Stat. Ann. § 2C:33-2 (West 1982 & Supp. 1994).  In seeking to determine whether that element could be met here, we turn to New Jersey

(..continued)
          law enforcement officer from effecting a
          lawful arrest . . . .

<u>Id.</u> § 2C:29-2.

[10].   This reasoning does not apply to officers Trembow and Vanderweil.  Summary judgment is appropriate as to them because the uncontested evidence demonstrates that Kirkland told each of them that Groman had punched her.  This is sufficient for them to have believed probable cause existed, and also insulates them from plaintiffs' claim of false imprisonment, <u>Baker v. McCollan</u>, 443 U.S. 137, 143-44 (1979).

case law.  In State v. Finate, 80 A.2d 341, 341 (N.J. Super. Ct. Law Div. 1951), the police charged the first defendant with uttering "certain loud and offensive or indecent language from the [defendant's] yard," and the second defendant (his wife) with doing the same from her porch.  They were charged with violating an earlier version of the statute under which Groman was arrested.[11]  The court held the statute "indicates that a person cannot be charged with an offense thereunder while on his own property" and reversed the convictions.  Id. at 342.

The opinion in Finate, in conjunction with the current statutory text,[12] leads us to conclude that Groman could not have committed the offense of disorderly conduct in his own home.[13]

---

[11].  The statute provided:

> **Loitering in public places or on private property; offensive language therein or thereon.**
> Any person who, being under the influence of intoxicating liquor, shall loiter in any public or quasi-public place, or in or upon any private property not his own within this state, or who, not being under the influence of intoxicating liquor, shall there indulge in and utter loud and offensive or indecent language, shall be adjudged a disorderly person.

N.J. Rev. Stat. § 2:202-8 (1937).

[12].  See supra note 8.

[13].  Although New Jersey case law is sparse, case law from other jurisdictions supports this conclusion.  In Commonwealth v. Weiss, 490 A.2d 853 (Pa. Super. Ct. 1985), the court dealt with a statute very similar to this one.  The statute provided:

> **Disorderly conduct**

The police could not, therefore, have had probable cause to

arrest him on that charge.  Since it is a jury question whether


(..continued)

> **(a) Offense defined**.--A person is guilty
> of disorderly conduct if, with intent to
> cause public inconvenience, annoyance or
> alarm, or recklessly creating a risk thereof,
> he:
>
> . . . .
>
> (3) uses obscene language, or makes an
> obscene gesture;
>
> . . . .
>
> **(c) Definition**.--As used in this section
> the word "public" means affecting or likely
> to affect persons in a place to which the
> public or a substantial group has access;
> among the places included are highways,
> transport facilities, schools, prisons,
> apartment houses, places of business or
> amusement, any neighborhood, or any premises
> which are open to the public.

(quoting 18 Pa. Cons. Stat. § 5503(a)(3)).  In Weiss, the
defendant had screamed epithets at the police officer who broke
down her door to arrest her husband.  Id. at 854.  The court
reversed defendant's conviction because the requirement that the
conduct be in "public" was not satisfied.  Id. at 855-57.

Likewise, in People v. Jerome, 168 N.Y.S.2d 452 (County
Ct. 1957), the court reversed defendant's conviction for cursing
at a police officer from inside a private residence, holding that
the private residence could not be a "public place" for purposes
of the New York disorderly conduct statute.  Id. at 455.  In
Whittington v. State, 634 N.E.2d 526 (Ind. Ct. App. 1994), the
defendant yelled at police officers who had gone to his house
because of a report of a domestic disturbance there.  The
defendant had apparently punched his sister.  Id. at 526.  The
officers charged him with violating the disorderly conduct
statute because of his verbal attacks on the officers, and he was
convicted.  The court, in reversing his conviction, stressed that
"[t]he forum employed by [defendant] was his own home.  Thus, the
potential for invading the right of others to peace and quietude
was diminished."  Id. at 527.  Even though the statute did not
have the "public" element that the New Jersey law contains, the
court reversed his conviction on the basis that his behavior was
not sufficiently public.  Id.

the police had probable cause to arrest Groman on the aggravated assault charge, and since the other two charges could not have provided probable cause for Groman's arrest, we will reverse the district court's grant of summary judgment on the false arrest claim as to police officer Kirkland.

A false imprisonment claim under 42 U.S.C. § 1983 is based on the Fourteenth Amendment protection against deprivations of liberty without due process of law. Baker v. McCollan, 443 U.S. 137, 142 (1979). The Court in Baker made it clear an arrest based on probable cause could not become the source of a claim for false imprisonment. Id. at 143-44. On the other hand, where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest. Thomas v. Kippermann, 846 F.2d 1009, 1011 (5th Cir. 1988). A false imprisonment claim under § 1983 which is based on an arrest made without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures. Barna v. City of Perth Amboy, 42 F.3d 809, 820 (3d Cir. 1994); Guenther v. Holmgreen, 738 F.2d 879, 883 (7th Cir. 1984), cert. denied, 469 U.S. 1212 (1985); Weber v. Village of Hanover Park, 768 F. Supp. 630, 634-36 (N.D. Ill. 1991). If the jury found in plaintiffs' favor on the false arrest claim, it could also find that Groman suffered a violation of his constitutional rights by virtue of his detention pursuant to that arrest. See Pritchard v. Perry, 508 F.2d 423, 425 (4th Cir. 1975) (holding "[t]hat an infringement of personal liberty such as follows from an unconstitutional arrest has resulted in

but a short period of restraint . . . manifestly cannot . . . abort an aggrieved plaintiff's right of action under Section 1983.").  We will reverse the grant of summary judgment on the false imprisonment claim as to police officer Kirkland.

Plaintiffs also assert a claim under § 1983 based upon a failure to provide necessary medical treatment.  Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs.  Walmsley v. City of Phila., 872 F.2d 546, 551-52 (3d Cir.), cert. denied, 493 U.S. 955 (1989) (citing Estelle v. Gamble, 429 U.S. 97 (1976)).  The record clearly establishes that the police offered Groman medical assistance which he consistently and obstinately rejected.  Defendants were not deliberately indifferent to Groman's medical needs.

Plaintiffs' three other claims against the police under § 1983--unlawful search and seizure, conspiracy, and denial of right to counsel--may be disposed of briefly.  While plaintiffs raised the first two claims in their complaint, the district court properly observed that they have provided no factual basis upon which a reasonable jury could find in their favor.  Indeed, plaintiffs present these claims in the form of conclusory allegations, and a close review of the record reveals no factual basis upon which they could be sustained.  Accordingly, we will affirm the district court on these claims.  Finally, plaintiffs have not appealed the grant of summary judgment on the claim of a denial of the right to counsel.

B.   Claim Against the Township of Manalapan

        Plaintiffs urge us to sustain their cause of action against the Township of Manalapan under § 1983 for negligent supervision.  Plaintiffs recognize the Supreme Court in Monell v. Department of Social Services, 436 U.S. 658, 694-95 (1978), held a plaintiff must prove the existence of a policy or custom that has resulted in a constitutional violation in order to make a municipality liable under § 1983.  A municipality cannot be held liable under § 1983 on a respondeat superior theory.  Id. at 691. The Court has also stated that liability for failure to train subordinate officers will lie only where a constitutional violation results from "deliberate indifference to the constitutional rights of [the municipality's] inhabitants."  City of Canton, Ohio v. Harris, 489 U.S. 378, 392 (1989).  This deliberate indifference standard applies to plaintiffs' allegations of negligent supervision and failure to investigate. Cf. San Filippo v. Bongiovanni, 30 F.3d 424, 445-46 (3d Cir. 1994) (holding deliberate indifference standard applies to failure to investigate dismissal of an employee that may have been in violation of that employee's First Amendment rights), cert. denied, 115 S. Ct. 735 (1995).  Further, in Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985), the Court held that "a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  See also Colburn v. Upper Darby

Township, 838 F.2d 663, 672 (3d Cir. 1988), cert. denied, 489 U.S. 1065 (1989) (holding allegations of three similar incidents enough to sustain a claim where a single incident presumably would not be).

It is clear that plaintiffs' claim against the municipality is unsubstantiated. Plaintiffs assert two bases for their claim of liability based on municipal policy. First, they make vague assertions about the police department's failure to investigate other wrongdoings, and second, they point to the incident in this case. Plaintiffs' allegations about the Township's failure to investigate have virtually no evidentiary support in the record, and this case standing alone does not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983. Tuttle, 471 U.S. at 823-24. The record will not support a reasonable jury finding of a municipal policy or custom of "negligent supervision" which rises to the level of deliberate indifference required for § 1983 liability.

C. Claims Against the Englishtown-Manalapan First Aid Squad and its Members

We turn now to plaintiffs' claims against defendants Englishtown-Manalapan First Aid Squad and squad members Edward T. Moriarty, Tracie Zachary, James Paulser, and Joseph Bokenko[14] for

_____

[14]. Plaintiffs also named paramedics from the Centra State Medical Center as defendants in their second amended complaint. Second Am. Compl. ¶ 1. But the evidence fails to show that the Centra State paramedics had anything to do with the allegations in this case. Further, as plaintiffs have failed to address the grant of summary judgment to these defendants on appeal, their claims are abandoned. Travitz v. Northeast Dept. ILGWU Health & Welfare Fund, 13 F.3d 704, 711 (3d Cir.), cert. denied, 114 S. Ct. 2165 (1994). See also Simmons v. City of Phila., 947 F.2d

conspiracy to violate constitutional rights and for failure to provide necessary medical treatment.  The first aid squad's involvement in the alleged conduct forming the basis of these claims was minimal.

The first aid squad attempted to treat Groman at his house and later at the police station.  Both times the police caused the squad to be dispatched.  It is uncontroverted that Groman adamantly refused the squad members' medical attention, although at the police station one squad member was able to take Groman's blood pressure.  Groman repeatedly and insistently called the squad members incompetent and rejected their medical attention at the police station even after they informed him he could go to the hospital even though he had been arrested.

As we have noted, a suit under § 1983 requires the wrongdoers to have violated federal rights of the plaintiff, and that they did so while acting under color of state law.  42 U.S.C. § 1983.  As the "under color of state law" requirement is part of the prima facie case for § 1983, the plaintiff bears the burden of proof on that issue.  West v. Atkins, 487 U.S. 42, 48 (1988).  The color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law.  Versarge v. Township of Clinton, N.J., 984 F.2d 1359, 1363 (3d Cir. 1993).

(..continued)
1042, 1065-66 (3d Cir. 1991) (observing a mere passing reference is insufficient to bring an issue before the court on appeal), cert. denied, 112 S. Ct. 1671 (1992).

Where the actors are not state or municipal officials, but are private individuals or associations, we still must address whether their activity can nevertheless be deemed to be under color of law.  The inquiry is fact-specific.  <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 939 (1982); <u>Krynicky v. University of Pittsburgh</u>, 742 F.2d 94, 97-98 (3d Cir. 1984), <u>cert.</u> <u>denied</u>, 471 U.S. 1015 (1985).  The first aid squad's relationship to the Township therefore is crucial to our analysis under § 1983.  The first aid squad members here were not employed by the Township.  They were volunteers, and the squad itself was a private organization.  The first aid squad received at least $25,000 annually from the Township, but it is not clear how much of the squad's total budget this amount comprised, nor what, if any, oversight the Township exercised over the squad's operations.  Defendants' unrebutted assertion is that the first aid squad received no health benefits or insurance coverage from either Manalapan or Englishtown and that the squad was not under the formal direction or control of either municipality.

The color of state law[15] analysis can be difficult, but is grounded in a basic and clear requirement, "that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West, 487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)). A private action is not converted into one under color of state law merely by some tenuous connection to state action. The issue is not whether the state was involved in some way in the relevant events, but whether the action taken can be fairly attributed to the state itself. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974). As the Supreme Court has stated: "we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." NCAA v. Tarkanian, 488 U.S. 179, 192 (1988).

Supreme Court jurisprudence outlines several approaches or discrete tests for detecting the presence of action under color of state law.[16] The tests have included the exclusive

---

[15]. The "under color of state law" inquiry under 42 U.S.C. § 1983 and the "state action" requirement under the Fourteenth Amendment to the United States Constitution are identical in most contexts. Robison v. Canterbury Village, Inc., 848 F.2d 424, 427 n.3 (3d Cir. 1988). Conduct satisfying the state action requirement under the Fourteenth Amendment will satisfy the § 1983 requirement as well, but the reverse is not necessarily true. Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 n.18 (1982). For convenience we will use the terms interchangeably.

[16]. We note initially that, as one commentator has observed:

> Imposing categories and labels on the
> Court's different approaches to state action
> issues is somewhat arbitrary and potentially

government function approach, see Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 157-58 (1978), the joint participation or symbiotic relationship approach, see Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982); Blum v. Yaretsky, 457 U.S. 991, 1010-11 (1982), and the nexus approach, see Jackson, 419 U.S. at 351.[17]

(..continued)

>misleading. The Court seldom describes its decisions as creating a structure of discrete state action theories. Rather, the Court's decisions follow the more traditional judicial style of deciding each case based on the facts of the case, guided by similarly fact-specific decisions of the past. In addition, the Court uses different phrases to refer to the same or similar theories. . . . Nonetheless, the Court's state action decisions do create some clearly distinguishable approaches to the state action issue.

Henry C. Strickland, The State Action Doctrine and the Rehnquist Court, 18 Hastings Const. L.Q. 587, 596-97 (1991) (citations omitted). We also observe that lower courts have routinely treated the state action inquiry as including several discrete tests. See, e.g., McKeesport Hosp. v. Accreditation Council, 24 F.3d 519, 524 (3d Cir. 1994); Conner v. Donnelly, 42 F.3d 220, 223-24 (4th Cir. 1994); Sherman v. Consolidated Sch. Dist. 21, 8 F.3d 1160, 1168 (7th Cir. 1993), cert. denied, 114 S. Ct. 2109 (1994); Lopez v. Department of Health Serv., 939 F.2d 881, 883 (9th Cir. 1991) (per curiam); Yeager v. City of McGregor, 980 F.2d 337, 339 (5th Cir.), cert. denied, 114 S. Ct. 79 (1993).

[17]. Although the Supreme Court's recent pronouncement on the state action inquiry in Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991), does not explicitly restate these approaches, it does refer approvingly to past state action jurisprudence and cites favorably to its own precedent, including Lugar in which the Court had observed:

>[That] which would convert [a] private party into a state actor might vary with the circumstances of the case. . . . [T]he Court has articulated a number of different factors or tests in different contexts . . . . Whether these different tests are actually different in operation or simply different

(..continued)
>ways of characterizing the necessarily fact-
>bound inquiry that confronts the Court in
>such a situation need not be resolved here.

Lugar, 457 U.S. at 939.  After citing favorably to Lugar, the Edmonson Court noted:

>[O]ur cases disclose certain principles of
>general application.  Our precedents
>establish that, in determining whether a
>particular action or course of conduct is
>governmental in character, it is relevant to
>examine the following: the extent to which
>the actor relies on governmental assistance
>and benefits; whether the actor is performing
>a traditional governmental function; and
>whether the injury caused is aggravated in a
>unique way by the incidents of governmental
>authority.  Based on our application of these
>three principles to the circumstances here,
>we hold that the exercise of peremptory
>challenges by the defendant in the District
>Court was pursuant to a course of state
>action.

Edmonson, 500 U.S. at 621-22 (citations omitted).  We and other circuits have not read this passage as necessarily mandating one specific method of performing the state action inquiry.  See McKeesport Hosp., 24 F.3d at 524; Connor, 42 F.3d at 223-24; Sherman, 8 F.3d at 1168; Lopez, 939 F.2d at 883; Yeager, 980 F.2d at 339.  The opinion in Edmonson appears neither to restrict courts to one specific approach nor to foreclose them from employing various approaches as warranted by the particular circumstances of the cases before them.  The state action inquiry is "necessarily fact-bound," Lugar, 457 U.S. at 939, and the approach a court uses to conduct that inquiry should likewise be tailored to the facts of the case before it.

But any approach a court uses must remain focused on the heart of the state action inquiry, which, as we noted above, is to discern if the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  Edmonson emphasized the importance of this inquiry.  500 U.S. at 620.

Plaintiffs assert the first aid squad was performing an exclusive government function in its treatment of Groman. The Supreme Court has made clear that the scope of exclusive government functions is limited, reaching only those activities that have been "traditionally the exclusive prerogative of the State." Rendell-Baker, 457 U.S. at 842 (quoting Jackson, 419 U.S. at 353). See also Flagg Bros., 436 U.S. at 158 (stating "[w]hile many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State'"); cf. Evans v. Newton, 382 U.S. 296, 299 (1966) (holding "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations").[18]

---

[18]. Although the Supreme Court in Edmonson framed the inquiry as the "traditional government function" inquiry, 500 U.S. at 621, rather than as the "exclusive government function" test, the Court also held "[t]he selection of jurors represents a unique governmental function . . . ." Id. at 627 (emphasis added). The word "unique" in this context appears synonymous with "exclusive," and thus it seems probable the Court did not intend to alter the test for all purposes but rather to permit different analyses depending on the circumstances. Most appellate cases are in accord with this reading. We note especially the opinion in UAW, Local 5285 v. Gaston Festivals, Inc., No. 94-1387, 1995 WL 7677, at *9 n.2 (4th Cir. Jan. 10, 1995), in which the court declined to read the Edmonson Court's odd omission of the "exclusivity" requirement as adopting a new test. The court observed:

> The Court in Edmonson seemed to ignore the "exclusivity" requirement of the "traditionally exclusive government function" test, Edmonson, 500 U.S. at 621, 624-28, and was criticized by the dissent for having "misstated the law," see id. at 639 (O'Connor, J., dissenting). The Court's

In the course of enunciating the contours of what constitutes an exclusive government function, the Supreme Court

(..continued)
>omission of this requirement raises a question as to whether the standard still includes such a requirement.  See, e.g., McKeesport Hospital v. Accreditation Council, 24 F.3d 519, 528 (3d Cir. 1994) (Becker, J., concurring).  However, we do not believe the Supreme Court would have attempted to change radically the government function standard set forth in Jackson, 419 U.S. at 353, and thereafter applied consistently in Flagg Bros., 436 U.S. at 157-58, Rendell-Baker, 457 U.S. at 842, Blum v. Yaretsky, 457 U.S. 991, 1005, 1011-12 (1982), [San Francisco Arts & Athletics, Inc. v. United States Olympic Committee], 483 U.S. [522,] 544-45 (1987), and NCAA v. Tarkanian, 488 U.S. 179, 197-98 n.18 (1988), through the transparent puerilism of simple omission.  If it had intended to change the law in this respect, we believe it would have said so explicitly.  Moreover, the ultimate reasoning of the Court in Edmonson was that juror selection was traditionally an exclusive governmental function.  See, e.g., Edmonson, 500 U.S. at 627 ("The selection of jurors represents a unique governmental function delegated to private litigants by the government and attributable to the government . . . .").  Accordingly, we proceed on the understanding that the "exclusivity" requirement must be satisfied.

Gaston Festivals, 1995 WL 7677, at *9 n.2 (emphasis omitted); see also McKeesport Hosp., 24 F.3d at 524; Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707, 710-11 (3d Cir. 1993); Andrews v. Federal Home Loan Bank, 998 F.2d 214, 217 (4th Cir. 1993); Yeager, 980 F.2d at 340.  But cf. Sherman, 8 F.3d at 1169 (formulating the inquiry as one into the existence of a "traditional state function," but also citing to Flagg Bros. Inc. v. Brooks, 436 U.S. 149, 158 (1978), where the Supreme Court stated: "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State'").

has held that receipt of public funds and the performance of a function serving the public alone are not enough to make a private entity a state actor. Rendell-Baker, 457 U.S. at 840, 842. Our decision in Black by Black v. Indiana Area School District, 985 F.2d 707, 710-11 (3d Cir. 1993), follows Rendell-Baker and holds a school bus driver is not performing an exclusive government function even though paid by the state and performing a service for the public. Plaintiffs' reliance then on two factors--public funding and service to the public--is by itself insufficient, and plaintiffs have presented no other evidence which might persuade us that the first aid squad here was performing an exclusive government function.

Plaintiffs also urge us to follow by analogy a decision from the Court of Appeals for the Second Circuit that held a volunteer fire company to be an exclusive government actor. Janusaitis v. Middlebury Volunteer Fire Dep't, 607 F.2d 17 (2d Cir. 1979). But Janusaitis predates the seminal cases Rendell-Baker and Blum, and its holding is ambiguously grounded in both the exclusive government function and the symbiotic relationship tests. Janusaitis, 607 F.2d at 23. Recently, the Court of Appeals for the Fifth Circuit reached a contrary result to Janusaitis in Yeager v. City of McGregor, 980 F.2d 337, 343 (5th Cir.), cert. denied, 114 S. Ct. 79 (1993). The Yeager court found the volunteer fire company did not serve an exclusive government function on two grounds: first, since Texas law allowed but did not compel the city to establish a fire department it could hardly be called an exclusive government

function; and second, it took "judicial notice of the fact that there are a variety of private sector fire fighting alternatives; and fire fighting is not generally an exclusive government function." Id. at 340-41 (footnotes omitted). The court also observed that the state action determination was important to the extent it helps protect voluntary organizations from needless lawsuits. Id. at 339.

While there are similarities between volunteer fire departments and volunteer first aid squads, there are sufficient differences that may counsel against adopting this analogy. First aid squads perform different functions from fire departments.[19] To the extent we do find similarities, we find the court's analysis in Yeager more persuasive than the court's in Janusaitis and more consonant with controlling precedent,

---

[19]. Among other differences, first aid squads usually render assistance when they have a person's actual or implied consent. First aid squad member Moriarty's testimony demonstrates that the squad members were aware of that consensual relationship:

> Q: Why did you elect not to treat Mr. Groman, even over his objection, whether verbal or physical?
>
> A: Part of the treatment would be to transport the patient; and if I were to transport the patient without his consent, it would be kidnaping.
>     We cannot force anybody to be treated. We can recommend, for their good and welfare, that they allow us to treat them, but we cannot force them to allow us to treat them. That's why I elected to obtain or attempted to obtain a medical release.

Moriarty Dep., Defendant's App. at 51-52.

although we do not explicitly adopt the analysis in Yeager.  We must keep in mind the Supreme Court's admonition to pay close attention to the facts of each case while conducting the state action inquiry.  Lugar, 457 U.S. at 939.  Accordingly, we cannot accept Groman's contention that a volunteer first aid squad would be deemed to perform an exclusive government function merely because a volunteer fire department had been held to perform one.  We find plaintiffs have failed to meet their burden of demonstrating the first aid squad here was performing an exclusive government function.

Plaintiffs' other theories to ground a finding of state action can be analyzed under a general conceptual inquiry, in which we seek to ascertain "the degree to which the state and the [private] entity exist in a 'symbiotic relationship' or under circumstances where the conduct of the private actor can be fairly imputed as that of the state."  Yeager, 980 F.2d at 342 (citing Jackson, 419 U.S. at 351; San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522, 556 (1987)).  The Supreme Court has frequently discussed the boundaries of this branch of the state action doctrine.  In Rendell-Baker, the Supreme Court held a private school which was carrying out a state-sponsored program and which received at least ninety percent of its funds from the state was nevertheless not a state actor.  457 U.S. at 840-43.  In Blum, the Court held private nursing homes were not state actors even though they were extensively funded and regulated by the state.  457 U.S. at 1011-12.  While the exact contours of this state action inquiry are

difficult to delineate, the interdependence between the state and private actor must be pronounced before the law will transform the private actor into a state actor.  See id. at 1004; Boyle v. Governor's Veterans Outreach & Assistance Ctr., 925 F.2d 71, 76 (3d Cir. 1991).  The first aid squad, though financially assisted by the Township and (we assume here) functioning as support to the police, nevertheless did not have its professional decisions dictated or guided by the state.  There is no evidence that the Township controlled the first aid squad's professional conduct. See Polk County v. Dodson, 454 U.S. 312, 324-25 (1981).

Given the relationship between the first aid squad and the Township here, we find no symbiotic relationship, joint participation, or other connection sufficient to demonstrate the first aid squad was acting under color of state law.  Neither the squad's receipt of public funds, nor the police's request for the first aid squad, nor Groman's status as a person in custody at the time of the squad's second response is enough to create state action on the part of the first aid squad.  Even if the events created an affirmative obligation under the Due Process Clause for the police to provide medical care, City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244-45 (1983), this obligation did not transform the first aid squad into a state actor.  As we have held, the police fulfilled their constitutional obligation by calling the first aid squad, and the first aid squad's actions do not make them state actors for purposes of § 1983.

Accordingly, we will affirm the district court's grant of summary judgment on plaintiffs' claims against the Englishtown-Manalapan First Aid Squad, Edward T. Moriarty, Tracie Zachary, James Paulser, and Joseph Bokenko. Although our disposition of the color of state law requirement makes it unnecessary for us to reach the issue of whether plaintiffs have a colorable claim of a violation of federal rights by the first aid squad and its members, we are compelled to note that the record contains no evidence of a valid claim.

IV.

We will reverse the district court's grant of summary judgment on plaintiffs' claim of excessive force under 42 U.S.C. § 1983 as to officers Kirkland, Trembow, and Vanderweil, and on plaintiffs' false arrest and false imprisonment claims against officer Kirkland. We will remand these claims to the district court. We will affirm the district court's grant of summary judgment on all other federal claims. The district court declined to exercise supplemental jurisdiction over plaintiffs' state law tort claims because it found no cognizable federal claim. We will vacate that portion of the district court's order so it can determine whether to hear the state claims along with the federal claims.